**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

------------------------------------------------------------------ X
MARTHA UGALDE,

                        Plaintiff,                  Civil Action No.:

       v.

                                                **COMPLAINT**

VIVARIA FLORIDA LLC, CENTRAL FLORIDA
NIEVES HOLDINGS LLC, SOUTH FLORIDA
NIEVES HOLDINGS LLC, VIVARIA OHIO LLC,   **Jury Trial Demanded**
VIVARIA LLC and FRANCISCO JAVIER
GAVILAN, in his individual and professional
capacities,

                      Defendants.
------------------------------------------------------------------X

Plaintiff Martha Ugalde, as and for her Complaint against Defendants Vivaria Florida LLC, Central Florida Nieves Holdings LLC, South Florida Nieves Holdings LLC, Vivaria Ohio LLC and Vivaria LLC (altogether, "Vivaria," "Vivaria Group" or the "Company"), and Francisco Javier Gavilan ("Mr. Gavilan") (Vivaria Group and Mr. Gavilan will be referred together as "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Martha Ugalde, a Hispanic woman of Mexican descent, was a highly valued and dedicated assistant to Defendant Francisco Javier Gavilan, the Chief Executive Officer ("CEO") of Vivaria Group, for over a decade. Unfortunately, this all changed after Ms. Ugalde complained to Mr. Gavilan about how his wife, Gisele Balbo, who also worked at Vivaria Group, had called her a "**fucking Mexican**" merely because Ms. Ugalde refused to give Ms. Balbo unauthorized access to the Company's computer server account.

2.      Shockingly, rather than protect a loyal employee who had just been the subject of a disgusting, racist verbal attack, Mr. Gavilan decided to punish Ms. Ugalde for mustering the courage to challenge racism and discrimination in the workplace perpetrated by his wife.

3.      Indeed, within hours of learning that she had been the victim of discrimination and race-based harassment, Mr. Gavilan called Ms. Ugalde a liar and began laying the groundwork for Ms. Ugalde's eventual firing.

4.      Over the course of the next few days, Mr. Gavilan unlawfully retaliated against Ms. Ugalde by suspending her work email account, telling her to not report to work, changing the locks on the office door, clearing out her desk, suspending her from work indefinitely, telling other employees that she was no longer an employee of Vivaria Group, and refusing to inform her when or if she could return to work.

5.      Ms. Ugalde's 12 years of unwavering and dedicated service simply went by the wayside as a result of her decision to engage in protected activity after being called a "fucking Mexican."

6.      In addition, for years, Defendants failed to pay Ms. Ugalde the overtime wages she was owed after unlawfully misclassifying her as an overtime exempt employee.  As such, Ms. Ugalde is also entitled to overtime compensation for her work at Vivaria.

7.      Ms. Ugalde now brings this action to redress the unlawful employment practices committed against her, including Defendants' unlawful retaliation against her due to her complaints of racial and/or national origin discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as well as Defendants' failure to pay Ms. Ugalde overtime wages in violation of the Fair Labor Standards Act ("FLSA").

## ADMINISTRATIVE PREREQUISITES

8. Simultaneously with the filing of this Complaint, Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which will be cross-filed with the Florida Commission on Human Relations ("FCHR"), alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act of 1992, §§ 760 *et seq.* ("the FCRA").

9. Upon issuance of a Notice of Right to Sue from the EEOC and/or the FCHR, Plaintiff shall seek leave to amend this Complaint to include claims under Title VII and the FCRA.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and the FLSA.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

12. Plaintiff Martha Ugalde is a former Assistant to Defendant Gavilan at Vivaria Group. Ms. Ugalde is a resident of the State of Florida and, at all relevant times herein, met the definition of an "employee" and/or "covered employee" under all relevant statutes, and performed work and services for all corporate entities making up the Vivaria Group.

13. Defendant Vivaria Florida LLC ("VF") is a Florida limited liability corporation registered at 1640 W. Oakland Park Blvd, Suite 304, Oakland Park, FL 33311. In its filings with

the Florida Division of Corporations, Vivaria Florida LLC lists Mr. Gavilan as its President. Vivaria Florida LLC owns and controls Sbarro restaurant franchises located throughout Florida, including at Dolphin Mall, Coral Square, Coral Bay, Miami Beach, Wellington Mall, Ocean Drive, Biscayne, and Coral Ridge Mall. Vivaria Florida LLC is also the company from which Plaintiff's wages appeared to be drawn, *i.e.* its name appeared on Plaintiff's paychecks. At all times relevant herein, Vivaria Florida LLC was and is an "employer" under all relevant statutes.

14.     Defendant Central Florida Nieves Holdings LLC ("CFN") is a Florida limited liability corporation registered at 1640 W. Oakland Park Blvd, Suite 304, Ft. Lauderdale, FL 33311. In its filings with the Florida Division of Corporations, Central Florida Nieves Holdings LLC lists Mr. Gavilan as its President. Central Florida Nieves Holdings LLC owns and operates several Sbarro restaurant franchises throughout Florida, including in Florida Mall, Millenia Mall, Orlando Premium Outlet, The Avenues Mall, Volusia Mall and Jackson Memorial Hospital. At all times relevant herein, Central Florida Nieves Holdings LLC was and is an "employer" under all relevant statutes.

15.     Defendant South Florida Nieves Holdings LLC ("SFN") is a Florida limited liability corporation registered at 1640 W. Oakland Park Blvd, Suite 304, Ft. Lauderdale, FL 33311. In its filings with the Florida Division of Corporations, South Florida Nieves Holdings LLC lists Mr. Gavilan as its President. South Florida Nieves Holdings LLC owns and operates several Sbarro restaurant franchises throughout Florida, including in Galleria Mall, Sawgrass Mall, Boynton Mall, Treasure Coast, Palm Beach Outlet, The Gardens Mall and Westland Shopping Center. At all times relevant herein, South Florida Nieves Holdings LLC was and is an "employer" under all relevant statutes.

16. Defendant Vivaria Ohio LLC ("VO") is an Ohio limited liability corporation registered at 1187 Olentangy River Road, Columbus, OH 43212. In its filings with the Ohio Secretary of State, Vivaria Ohio LLC lists Mr. Gavilan as its Agent and an Incorporator. Vivaria Ohio LLC owns and operates four Cucinova restaurant franchises in Ohio. At all times relevant herein, Vivaria Ohio LLC was and is an "employer" under all relevant statutes.

17. Defendant Vivaria LLC is a Puerto Rican limited liability corporation registered at 268 Avenue Ponce De Leon, Ste. 903, San Juan PR 00918, owned and operated by Defendant Gavilan. Vivaria LLC operates as a shell company, and transfers monies for operations between itself and VF, CFN, SFN and VO. In fact, funds from Vivaria LLC were used to open VF, CFN, SFN and VO. At all times relevant herein, Vivaria LLC was and is an "employer" under all relevant statutes.

18. VF, CFN, SFN, VO and Vivaria LLC will be referred together as Vivaria Group or Vivaria. All corporate entities within Vivaria Group are owned and operated by Defendant Gavilan, all transfer monies between one and another, all have bene incorporated to own and manage restaurant franchises either under the Sbarro or the Cucinova trademark, all have centralized operations governed by Defendant Gavilan, and all are managed as one entity. Plaintiff has performed work for all corporate entities making up the Vivaria Group. As such, the corporate entities making up the Vivaria group are run as a single enterprise, and all jointly employed Plaintiff.

19. Defendant Francisco Javier Gavilan is a resident of Boca Raton, Florida, is the President and CEO of all corporate entities making up the Vivaria Group, and supervised Plaintiff during her employment at Vivaria. At all relevant times, Defendant Gavilan met the definitions of "employer" and/or "covered employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

I.  **MS. UGALDE COMPLAINS ABOUT BEING CALLED A "FUCKING MEXICAN"**

20. From 2007 to 2019, Ms. Ugalde was continuously employed as Defendant Gavilan's Assistant (the last four years while Mr. Gavilan operated the Vivaria Group, which was created in 2015), and was at all times a loyal, dedicated and trusted employee.

21. On Thursday, February 21, 2019, Mr. Gavilan's wife, Gisele Balbo, who is of Brazilian descent, messaged Ms. Ugalde requesting the log-in information to access the Company's Google administrator account. Ms. Ugalde respectfully responded that she could not disclose this information unless Mr. Gavilan authorized such access.

22. In response, Ms. Balbo called Ms. Ugalde on the phone, berated her, and said to her in Spanish, "**Who do you think that you are? You are a <u>fucking Mexican</u>. When I command you to do something, you have to obey!**"

23. Ms. Balbo's vile and disgusting statement to Ms. Ugalde reflected her discriminatory animus towards employees of Mexican national origin and/or Hispanic ethnicity.

24. Ms. Ugalde was shocked by Ms. Balbo's conduct, and immediately reached out to Mr. Gavilan to tell him what happened. Mr. Gavilan, who is of Spanish descent, responded that he would look into the matter. Ms. Ugalde was so troubled by what Ms. Balbo had said that she suffered a panic attack, had trouble breathing and was shaking uncontrollably, causing her to have to leave work early.

25. After arriving home, Ms. Ugalde spoke with Mr. Gavilan and disclosed the full details surrounding the incident. Ms. Ugalde specifically complained that what Ms. Balbo had said was very racist. In response, Defendant Gavilan lashed out at Ms. Ugalde by scolding her and calling her a liar.

26. Later that evening, Ms. Ugalde spoke with Pedro Bitar, Vivaria's Chief Operating Officer, about the incident, and repeated the same information she gave to Mr. Gavilan.

27. That night, in an apparent attempt to lay the ground work for terminating Ms. Ugalde's employment, Mr. Gavilan sent Ms. Ugalde an email in which he took issue with her having left work early, even though he knew full well how upset Ms. Ugalde was by Ms. Balbo's conduct.

28. Ms. Ugalde was up that whole night, unable to sleep, suffering from anxiety, stress, fear and insomnia.

29. Ms. Ugalde replied to Mr. Gavilan's email the following morning, again recounting what occurred the day before, and advised that she would be taking a sick day. Later that day, Ms. Ugalde felt so ill that she tried to go see her doctor, but was told there was no availability for her until the following week.

30. Over that weekend, unbeknownst to Ms. Ugalde, the Company blocked her access to her work email account and certain work-related software. Upon discovering this, Ms. Ugalde contacted Mr. Gavilan to inquire, and once again made reference to the verbal abuse and racial harassment that she endured days earlier.

31. On Monday, February 25, 2019, Mr. Gavilan finally replied to Ms. Ugalde, and instructed her that she was not to return to the office until Wednesday, February 27, 2019. He gave no reason for this.

## II. MS. UGALDE'S EMPLOYMENT IS UNLAWFULLY TERMINATED BECAUSE SHE COMPLAINED ABOUT DISCRIMINATION AND HARASSMENT

32. On the morning of Wednesday, February 27, 2019, Ms. Ugalde arrived at Vivaria's office to discover that the locks on the office door had been changed, and that she could no longer access the office. Despite knocking on the door, nobody answered.

7

33. Later that day, Mr. Gavilan ordered Ms. Ugalde to meet him back at the office at 5:00 p.m.  At that time, Ms. Ugalde met with Mr. Gavilan and Jorge Ocasio, Vivaria's Finance Manager.  Mr. Gavilan told her, in a very intimidating manner, that he would be conducting an "investigation," that Ms. Ugalde was being placed on suspension until further notice without specifying whether she would still be paid or not, and that she was forbidden from coming to the office.  Mr. Gavilan also asked Ms. Ugalde to provide a written statement of the incident involving Ms. Balbo, even though she had already sent him numerous correspondences memorializing the event.

34. Soon thereafter, Ms. Ugalde's work desk was cleaned out, her personal property was discarded, and her colleagues and Vivaria suppliers were told that she no longer worked at the Company.

35. At no point since has Defendant Gavilan contacted Ms. Ugalde about returning to work, or even about the results of his so-called "investigation."  As such, it is clear that Mr. Gavilan never had any intention of allowing Ms. Ugalde to work again at Vivaria following her complaints of discrimination and harassment.

36. Rather, Mr. Gavilan decided to unlawfully terminate Ms. Ugalde's employment in retaliation for her having mustered the courage and strength to stand up against being called a vile and racist epithet by a fellow coworker who just happened to be his wife.

37. Mr. Gavilan's retaliation against Ms. Ugalde did not cease there.  Specifically, on or about March 26, 2019, Mr. Gavilan received a letter from Ms. Ugalde's counsel detailing the racial harassment and retaliation Ms. Ugalde had endured, and asking that Ms. Ugalde's decisions to engage counsel and to send the letter be kept private so that her reputation is not

harmed.  Nevertheless, Mr. Gavilan summoned his brother, Juan Gavilan, to reach out and intimidate Ms. Ugalde into dropping her claims.

38. Specifically, on April 2, 2019, Juan Gavilan called Ms. Ugalde on the phone, unsolicited, and told her that his brother, Defendant Gavilan, wanted to meet with her and make a deal "between [them]" without counsel.  Mr. Juan Gavilan also told Ms. Ugalde that proceeding with counsel would be "bad for everybody," that she will not win but the only winners would be the lawyers, that he was concerned about his brother, and that the Gavilans had always been "good" to her.

39. This was clearly an attempt to intimidate Ms. Ugalde and convince her to drop her claims or resolve them without the benefit of legal counsel – actions that would unquestionably deter other reasonable employees from complaining about discrimination, harassment and retaliation in the workplace.

40. Furthermore, even after Ms. Ugalde's counsel notified an attorney retained by Defendants that Defendant Gavilan's brother had reached out to Ms. Ugalde, and even though said attorney represented that Mr. Gavilan and his entire family were instructed by counsel to refrain from communicating with Ms. Ugalde, Juan Gavilan still sent a text message to Ms. Ugalde on April 4, 2019.

41. In that lengthy message, Mr. Juan Gavilan once again pleaded with Ms. Ugalde to speak to Defendant Gavilan in order to "fix this situation and not continue to make it ugly, which is what the lawyers love to do, to make them richer at the cost of their victims," and told her that "this will end very ugly."  This was yet another attempt to convince Ms. Ugalde to abandon her claims against Defendants, an act that would no doubt dissuade a reasonable employee from engaging in protected activity.

### III. MS. UGALDE WAS MISCLASSIFIED AS AN OVERTIME EXEMPT EMPLOYEE AND DENIED OVERTIME WAGES FOR YEARS

42. Ms. Ugalde has also been the victim of unlawful wage practices as a result of apparently being misclassified as an overtime exempt employee, resulting in Defendants' failure to pay her thousands of dollars in overtime wages throughout her tenure.

43. Notwithstanding any self-serving title Vivaria may have given Ms. Ugalde, her primary responsibility, at all relevant times, has been to serve as Mr. Gavilan's assistant and to engage in clerical, non-exempt, and non-discretionary work.

44. Further, Ms. Ugalde was never a manager or supervisor, nor did she ever manage any employees, make hiring or firing decisions, or make compensation-related decisions.

45. Rather, Ms. Ugalde was, at all times, supervised closely by her managers, and had no meaningful discretion or ability to make decisions on her won with respect to matters of significance involving the Vivaria Group.

46. Rather, Ms. Ugalde had to work upwards of 60 hour workweeks, including weekends, without being properly compensated at a rate of one and one-half times her regular wage for those hours worked over 40. As a result, Ms. Ugalde is owed thousands of dollars in unpaid overtime wages, in addition to liquidated damages and other penalties.

### FIRST CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**

47. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

48. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

49. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, insomnia, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

50. Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
**(Failure to Pay Overtime in Violation of the FLSA, 29 U.S.C. § 207)**

51. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

52. Plaintiff regularly worked in excess of 40 hours per workweek.

53. At all relevant times, Defendants operated under a decision, policy and plan, and under common policies, programs, practices, procedures, protocols, routines and rules of willfully failing and refusing to pay Plaintiff at one and one half times her hourly wage for all work in excess of 40 hours per workweek and failing to lawfully and properly classify Plaintiff as overtime eligible.

54. At all relevant times, Defendants willfully, regularly and repeatedly failed to pay Plaintiff at the required overtime rate, one and one half times her hourly wage for all hours worked in excess of 40 hours per workweek.

55. Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants damages in the amount of his respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with it, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, including overtime wages, compensation, seniority, and other benefits of employment;

D. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.        An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

G.        Prejudgment interest on all amounts due;

H.        An award of Plaintiff's reasonable attorneys' fees and costs; and,

I.        Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 30, 2019
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
     Bryan L. Arbeit
     (Bar No. 1010329)
     Douglas H. Wigdor
     (*pro hac vice* admission pending)
     Tanvir H. Rahman
     (*pro hac vice* admission pending)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
barbeit@wigdorlaw.com
dwigdor@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiff*